SOCIAL MEDIA VICTIMS LAW CENTER
Laura Marquez-Garrett SBN 221542
laura@socialmediavictims.org
Matthew P. Bergman
matt@socialmediavictims.org
Glenn S. Draper
glenn@socialmediavictims.org
Sydney Lottes, SBN 345387
sydney@socialmediavictims.org
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862

Attorneys for Plaintiffs

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| Elizabeth Mullen and N.M., | Case No.: |
| Plaintiffs, | COMPLAINT FOR PERSONAL INJURIES |
| vs. | |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; TIKTOK, INC.; BYTEDANCE, INC., | |
| Defendants. | JURY DEMAND |

COMES NOW PLAINTIFFS Elizabeth Mullen and N.M. and allege as follows:

In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth.

United States Surgeon General's Advisory December 7, 2021

Plaintiff Elizabeth Mullen, individually and on behalf of her minor child, N.M. (collectively, "Plaintiffs") bring this action for personal injuries against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), and TikTok, Inc. and ByteDance, Inc. (collectively, "TikTok"), for injuries caused because of N.M.'s use of the Instagram and TikTok social media products and allege as follows:

## I.  INTRODUCTION

1.    This product liability action seeks to hold Instagram and TikTok responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers in the United States by Meta and TikTok and specifically for personal injuries caused to Plaintiffs as the result of N.M.'s use of the Instagram and TikTok social media products.

2.    On December 7, 2021, the United States Surgeon General issued an advisory cataloging extensive evidence showing a dramatic increase in teen mental health crises including suicides, attempted suicides, and inpatient mental-health admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent,[1] and incidence of serious depression and dissatisfaction with life in this age group likewise increased dramatically; while the most significant and far-reaching change to the lives of young people during this same time period was the widespread adoption of mobile social media platforms, including and for purposes of this litigation, the Instagram and TikTok products designed and distributed by Defendants.

3.    Defendants advertise their products as "free" because they do not charge users for downloading or using them and tell users that their product features and recommendation systems deliver connections, experiences, and content likely to be desired by and of interest to each particular user. What Defendants do not tell users is that, in fact, they make their astronomical profits by targeting advertisements and harmful content to young users and by finding unique and

---

[1] The impact of this increase cannot be overstated.  By way of example, if the suicide rate in the United States and in children aged 10 to 18 had stayed at its 2007 rate though 2019 alone (not including suicides in the last three years), more than 9,000 children would still be alive.

increasingly dangerous ways to keep users hooked and coming back for more; and that Defendants are not programming or operating their technologies based on user interest, but instead, engagement and growth at any cost. In other words, Defendants are designing, distributing, programming, and operating their products to recommend content and push connections and experiences based on what they determine a user will be unable to look away from, as opposed to content, connections, and experiences of actual interest.

4.     Defendants also collects massive amounts of user information and data, including data indicative of protected class status, such as age, race, religion, gender, income, family status, and others.  Defendants' design, programming, and distribution decisions are such that their products disproportionately target, exploit, and addict users based on these types of protected characteristics, which is referred to as algorithmic discrimination or algorithmic bias.  Defendants know or should know that their technologies suffer from this defect but operate them regardless and have failed to warn users of such discrimination.

5.     Defendants do not warn consumers or their parents (in the case of minors) about any of the myriad harms they know or should know their products are causing.  Instead, Defendants have misdirected and deceived consumers and the general public through their advertising, representations, and even sworn statements made to Congress. Defendants mispresents the nature of their products and knowingly target, market to, and distribute their products to minors without regard for parental knowledge or consent.

6.     Plaintiffs bring claims of strict product liability based upon Defendants' defective design of their social media products that render such products harmful and not reasonably safe for ordinary consumers and minor users. It is technologically feasible for Defendants to design social media products, features, and settings that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' social media products with a negligible increase in production cost.

7.     Plaintiffs also bring claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and

emotional harms arising from foreseeable use of their social media products. The addictive quality of the Instagram and TikTok products and Defendants' harmful recommendation technologies (often referred to as algorithms) are not fully known or appreciated by minor users or their parents. Defendants market their products as fun and safe and represents that they are sending users content in which they are interested, not that they are sending children extreme content on the basis that they believe they will be unable to look away. Defendants failed to warn and are affirmatively misrepresenting the safety of their products to minors and their parents.

8. Plaintiffs also bring claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products are harmful to young users. Yet Defendants failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of the Instagram and TikTok products. Defendants created an attractive nuisance but refused to provide adequate safeguards from the harmful effects they knew were occurring on their wholly owned and controlled digital premises.

9. Plaintiffs also bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq*. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

10. Plaintiffs also bring a claim for unjust enrichment. Defendants received a direct benefit from the problematic and harmful use of their products as described herein. Under these circumstances, it would be unjust and inequitable for Defendants to retain those ill-gotten benefits.

11. Plaintiffs also bring a claim for invasion of privacy. Defendants' conduct detailed herein frustrated and intruded upon Plaintiff Elizabeth Mullen's fundamental right to protect her child and to monitor and control her child's use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

12. Lastly, Plaintiffs bring claims for sex discrimination pursuant to California's Unruh Civil Rights Act. Defendants are engaged in discriminatory practices, including but not limited to their programming and operation of recommendation technologies in a manner that discriminates

against users based on their age, gender, and other protect class characteristics. Defendants know or should know of the algorithmic bias defect in their product designs, programming, and operations but continue to engage in such discrimination regardless. California law prohibits such reprehensible conduct, including for online business establishments like Instagram and TikTok.

## II.    PARTIES

13.    Plaintiff Elizabeth Mullen ("Elizabeth") is N.M.'s parent and legal guardian. N.M. currently is 17 years old has suffered harms from her use of the Instagram and TikTok products. Elizabeth has not entered into a User Agreement or other contractual relationship with any of the Defendants in connection with N.M.'s use of the Instagram and TikTok social media products and, as N.M.'s parent and legal guardian, Elizabeth expressly disaffirms all User Agreements between N.M. and Defendants. Thus, Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreements.

14.    Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, applications that is widely available to users throughout the United States. At all times relevant hereto, Defendant Meta was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Meta Platforms, Inc.

15.    Defendant TikTok Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States. At all times relevant hereto, Defendant TikTok Inc. was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of TikTok Inc.

16.    Defendant ByteDance Inc. is a Delaware corporation with its principal place of business in Mountain View, CA. Defendant ByteDance owns or otherwise controls TikTok Inc., and owns, operates, or otherwise controls the TikTok social media platform. At all times relevant hereto, Defendant ByteDance Inc. was acting by and through its employees, servants, agents,

workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of ByteDance Inc.

17.     TikTok is highly integrated with its Chinese parent, ByteDance. TikTok's engineering manager works on both TikTok and ByteDance's similar Chinese app, Douyin. TikTok's development processes are closely intertwined with Douyin's processes. TikTok employees are also deeply interwoven into ByteDance's ecosystem. They use a ByteDance product called Lark, a corporate internal communications system like Slack but with aggressive performance-management features aimed at forcing employees to use the system more.

### III.    JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Defendants are residents of different states.

19.     This Court has general jurisdiction over Defendants because their principal place of business is in California, and they are "at home" in this State. This Court also has specific jurisdiction over Defendants because Plaintiffs' claims set forth herein arise out of and relate to its activities in the State of California.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants Meta and ByteDance reside in the Northern District of California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS

**A.  Meta's Facebook and Instagram Products**

21.     Meta, founded in 2004, is the world's largest social media company, and its motto until recently was "Move Fast and Break Things," while Instagram began as a simple photo-sharing application, which Meta purchased in 2012.

22.     When Meta began, access to its products were limited to college students, with email and/or domain verification to confirm the same.

23.     In September 2006, Meta opened Facebook up to everyone. It claimed that it provided access only to persons 13 and older, and that users under 18 should obtain parental

consent. But it also stopped verifying age or identity, to the point where Meta does not even verify existence of a valid email address – meaning that underage users enter nonsense email addresses and Meta provides access to limitless Facebook and Instagram accounts. These product changes were good for Meta's bottom line but resulted in the complete absence of reasonable safety features for children and teens as ensured unfettered access for them to Meta's social media products irrespective of age and/or parental consent. Meta's popularity and profits skyrocketed as a result.

24.    In 2009, Meta launched the "like" button product and, in 2011, it launched Facebook Messenger. By 2012, when Meta acquired the Instagram social media product, it was making rapid and significant changes to all its social media products – including Facebook and Instagram – which changes focused on increasing engagement at any cost. This included product changes, as well as changes in data collection and advertising policies and procedures; essentially any change Meta could think up that might bolster engagement and revenue, particularly among children and teens, and create greater addiction and network effects features to ensure that those users would be locked-in to its social media products for years to come. Unfortunately for the world, Meta made these changes at the direct expense of user safety and autonomy.

25.    In 2015 and 2016, Meta made more changes to its Facebook and Instagram content recommendation technologies, including programming its products for engagement rather than user interest or safety; and implementing a multitude of other technologies meant to help Meta determine what might catch each user's attention, irrespective of what the user requested or wanted to see. This included Meta's decision to collect, utilize, and/or sell user data in connection with activities taken *off* its Facebook and Instagram social media products. Essentially, most internet and/or device related activities were now subject to Meta's collection and control, with no transparency as to what Meta was doing with this extensive collection of user data. Attached hereto as **Exhibit A** is a document Meta publicly filed in December of 2022, which purports to be a list of "Hive tables that store user identifies with data as it enters Hive" (11,051 data points).  On information and belief, Meta cannot even be certain that this is every category of data it collects.

26.    Nor did Meta leadership use its new-found control in ethical or honest ways. Instead, it knowingly addicted its users and lied to governmental and investigative authorities and

to the American public, in the interest of its own profits and growth. To name only some examples,

a. <u>Cambridge Analytica</u>. Meta and its leadership "knew that the private information of millions of Facebook users had been used for nefarious purposes since at least 2015, but failed to cause Facebook to acknowledge or disclose this information." Instead, they "caused Facebook to actively obfuscate the extent of its information privacy and compliance failures. [Their] dishonesty knew few limits, as [Mark] Zuckerberg mislead United States Congress in hearing conducted in the wake of Cambridge Analytica, and UK authorities found that Facebook's responses to its inquiries had been conducted in '**bad faith**.'"[2]

b. On June 8, 2018, Facebook submitted certain written *Responses to Additional Questions from the Senate Commerce Committee*, which responses "further built on [Mark] Zuckerberg's false and misleading statements in his live testimony." *Id*. at ¶¶ 202-203; *see id*. at ¶¶ 203-216 (providing multiple examples taken from testimony and documentary evidence).

c. On February 18, 2019, the UK Committee Chair Damian Collins, made the following public statements,

> We believe that in its evidence to the Committee Facebook has often deliberately sought to frustrate our work, by giving incomplete, disingenuous and at times misleading answers to our questions.
>
> Even if Mark Zuckerberg doesn't believe he is accountable to the UK Parliament, he is to the billions of Facebook users across the world.

d. In litigation pending before the International Court of Justice stemming from the Rohingya genocide, Facebook took "aggressive measures to conceal evidence of its involvement."[3]

---

[2] Second Amended Verified Stockholder Derivative Complaint, filed in the Court of Chancery of the State of Delaware, C.A. No. 2018-0307-JRS, ¶ 13; *see also id*. at ¶¶ 176, 229.
[3] Class Action Complaint filed on December 6, 2021, in *Doe v. Meta Platforms, Inc*., Superior Court of the State of California for the County of San Mateo, ¶ 27; *citing* Robert Burnson, *Facebook's Stance on Myanmar Genocide*

e.      In testimony before Congress in September 2020, Tim Kendall, Facebook's first Director of Monetization likened Facebook's business model to that of Big Tobacco,

> At Facebook, I believe we sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create something useful and fun; we took a page from Big Tobacco's playbook, working to make our offering addictive at the outset….
>
> The next page in Big Tobacco's playbook was to add bronchodilators to cigarettes. This allowed the smoke to get in contact with more surface area of the lungs. Allowing for misinformation, conspiracy theories, and fake news to flourish were Facebook's bronchodilators.
>
> But that incendiary content wasn't enough. Tobacco companies then added ammonia to cigarettes to increase the speed with which nicotine traveled to the brain. Facebook's ability to deliver this incendiary content to the right person, at the right time, in the exact right way—through their algorithms—that is their ammonia. And we now know it fosters tribalism and division.
>
> Social media preys on the most primal parts of your brain; it provokes, it shocks, and it enrages….
>
> Facebook and their cohorts worship at the altar of engagement and cast other concerns aside, raising the voices of division, anger, hate, and misinformation to drown out the voices of truth, justice, morality, and peace.[4]

f.      Statements by Mr. Chairman Blumenthal at the October 5, 2021 Senate Hearing, based on Meta's own documents, which were provided to Senator Blumethal by the Facebook whistleblower:

> Among other revelations, the information that you have provided to Congress is powerful proof that Facebook knew its products were harming teenagers. Facebook exploited

*Records Assailed by Gambia*, BLOOMBERG (Oct. 28. 2021), https://www.bloomberg.com/news/articles/2021-10-28/facebook-sstance-on-myanmar-genocide-records-assailed-by-gambia.

[4] *Mainstreaming Extremism: Social Media's Role in Radicalizing America: Hearing Before the House Subcommittee on Consumer Protection and Commerce,* 116th Congress (Sept. 24, 2020) (statement of Timothy Kendall).

teens using powerful algorithms that amplified their insecurities and abuses through what it found was an addict's narrative. There is a question, which I hope you will discuss, as to whether there is such a thing as a safe algorithm. Facebook saw teens creating secret accounts that are often hidden from their parents as unique value proposition. In their words, a unique value proposition. A way to drive out numbers for advertisers and shareholders at the expense of safety, and it doubled down on targeting children pushing products on pre-teens not just teens, but pre-teens that it knows are harmful to our kids' mental health and wellbeing.

Instead of telling parents, Facebook concealed the facts, it sought to stonewall and block this information from becoming public, including to this committee when Senator Blackburn and I specifically asked the company. And still, even now, as of just last Thursday, when a Facebook witness came before this committee, it has refused this disclosure or even to tell us when it might decide whether to disclose additional documents. And they've continued their tactics, even after they knew the disruption it caused it. Isn't just that they made money from these practices, but they continued to profit from them. Their profit was more important than the pain that they caused.

Last Thursday, the message from Ms. Antigone Davis, Facebook's Global Head of Safety was simple, "This research is not a bombshell." and she repeated the line, not a bombshell. Well, this research is the very definition of a bombshell. Facebook and big tech are facing a big tobacco moment, a moment of reckoning, the parallel is striking. I sued big tobacco as Connecticut's attorney general, I helped to lead the states in that legal action and I remember very, very well, the moment in the course of our litigation when we learned of those files that showed not only that big tobacco knew that its product caused cancer but that they had done the research, they concealed the files, and now we knew and the world knew. And big tech now faces that big tobacco jaw dropping moment of truth. It is documented proof that Facebook knows its products can be addictive and toxic to children. And it's not just that they made money, again, it's that they valued their profit more than the pain that they caused to children and their families.[5]

---

[5] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript ("October 5, 2021, Senate Hearing Transcript"), Chairman Blumenthal at 00:04:09, 00:05:21, 00:06:14.

27.     With the knowledge that young users – children – were Meta's only opportunity for continued growth and market dominance in the United States, Meta ramped up its product development efforts and its marketing to children and teens. Meta designed several new products and re-designed several old ones on its Facebook and Instagram platforms, launched and marketed games and emojis, and became significantly more involved with content creation. It also made it easier for kids to hide accounts and switch between accounts on a single device and, at one point, launched a campaign to ensure that all teens knew of their ability to open multiple accounts.

28.     Meta also continued finding new ways to monetize user content and the users themselves, including development of incredibly complex and invasive advertising products, tools, and technologies – which have made Meta billions in revenue, at the expense of Meta's users.

29.     Meta designs and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase. The following are just a fraction of the disclosed Meta documents – Meta's own documents – proving Meta's knowledge of the harms its products are causing to young users,



"Teen Mental Health Deep Dive," Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA], published by the Wall Street Journal, p. 28.[6]



*Id.* at p. 30.

*Id.* at p. 54.

[6] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/



"Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US," p. 29.[7]



*Id*. at p. 30.

---

[7] https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf





*Id.* at p. 33 and 34.



*Id.* at p. 9. Meta documents also report that 13.5% of teen girls on Instagram say that the platform makes thoughts of Suicide and Self Injury (SSI) worse; while 17% of teen girls on Instagram say that the platform makes "Eating Issues" (*e.g.* anorexia and bulimia) worse,



*See,* https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/, Slide 14 of "Hard life moment – mental health deep dive." According to an article published by the Wall Street Journal,[8]

> For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls.
>
> "We make body image issues worse for one in three teen girls," said one slide from 2019, summarizing research about teen girls who experience the issues.
>
> "Teens blame Instagram for increases in the rate of anxiety and depression," said another slide. "This reaction was unprompted and consistent across all groups."
>
> Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram, one presentation showed.

Meta documents also discuss the fact that "Constant comparison on Instagram is 'the reason' why there are higher levels of anxiety and depression in young people."



*See, supra,* "Teen Mental Health Deep Dive," p. 27.

  30. What the Facebook Papers establish is that the devastating social comparison harms teens are suffering in staggering rates are not the result of any one piece of content or interaction

---

[8] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

on a social media product, but rather, the result of these the deliberate and addictive designs and the sheer volume at which companies like Meta identify and push certain, unrequested content to young users – all for the benefit of their bottom line.

31.     Despite Meta's many harmful product changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements assuring the world that safety was Meta's top priority. For example, in February 2017, he posted on his personal Facebook "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Meta is for bringing communities together, promoting critically important social groups, and other statements that we now know to be untrue, and profoundly dangerous, given what was actually happening at Meta and what Mr. Zuckerberg knew about the harms his products were causing American youth.

32.     By 2017, however, Meta employees were already reporting to management that Facebook was causing harmful dependencies. Meta was studying and purposefully designing its products in a manner that required sunk cost and system effects that would ensure its ability to lock-in its young users – that is, to make sure that they would never leave. Meta was marketing to children under 18, as well as children under 13 despite clear legal mandates that it could not allow children under 13 on its social media products. And Meta leadership, Mark Zuckerberg himself, was actively rejecting proposed re-designs and fixes that would have minimized the harms Meta's products were actively causing to children and teen users because engagement was its first priority and teens and children its primary target for acquisition – Meta had long since identified teens as its key to success, including because teen users could influence and encourage their younger brothers and sisters to use Meta's products.

33.     The following is just one more published Meta document, in which Meta employees discuss the many ways they tried to make Meta's products safer for users over the years, only to be shut down by Meta leadership. This document (*Facebook's Frankenstein Moment*, published internally on September 24, 2017) includes multiple employee comments detailing product safety steps Meta leadership deliberately skipped, avoided, or ignored and false representations made to

the public when users inevitably were harmed as a result,[9]

I've been sitting on this for a couple days now, trying to figure out what rubbed me the wrong way about this article. Two quotes from the article, one from Sheryl's own post, put together really sum up what feels wrong.

"We never intended or anticipated this functionality being used this way..."

"Hiring people with darker views of the world could help Facebook anticipate conflicts and misuse."

The sarcastic part of me wants to say they misspelled "realistic views". But it turns out that's at the heart of what bothers me about this article. We do hire people who don't look at the whole world through rose-coloured "everyone is awesome and this could literally not go wrong" glasses. We have lots of people who have a more realistic (darker, pessimistic, whatever you want to call it) view of the world. We just don't tend to listen to them.

Totally agree ████ I especially feel this way about our Suicide and Self-Injury tools. I often get feedback that they agree with my views but can't or won't change things... your post is 100% spot on.

Like · Reply · 3y  5

I'm sure those that know me know I've felt this way a long time. And have forever been "that person" that keeps pointing out flaws and risks. To various degrees of success 😅. It's a bit of a running joke that we can just "dust off my deck from X yrs ago and take action"
This thread is amazing because it unites what my [kind] manager calls "divergent thinkers".
We see the car crashes before they happen, we care about system fundamentals to avoid risk. I am 100% aware that many of us saw (and reported) these problems WAY before they happened; many examples are on this thread.
So I have the ask that *everyone* (each of you) rally now to fix these issues "all hands on deck" style, and that *no one* let's these issues fade from focus without resolution.

Like · Reply · 3y 7

I don't go to Q&A. I look at the summaries and watch the specific questions that interest me, but after Zuck led the room in laughing at me after the last question I asked (and my exact point ended up getting proved within a year of asking IIRC), not to mention the increasing non-answers I'm seeing, I haven't seen the point in going or even asking Q&A questions.

If you (or anyone else) wants to raise this at Q&A, feel free to plagiarize this post wholesale. If I hear it was a good discussion, I'll watch it when the video hits HackTV.

Like · Reply · 3y  11

---

[9] https://www.documentcloud.org/documents/23322867-copy-of-facebook_s-frankenstein-moment_sanitize_opt, p. 1, 17, 26-27, 30.



I am late to the game here, but this made my heart so happy. I work on the Content Policy team, our job is to think of the worst of the worst ways people will behave and express themselves on our platform, and we're increasingly partnering with new products on their rules and systems pre-launch. But the MOST frustrating thing is not being listened to and then hearing these stories come out. My team consulted for Live; not only did we anticipate murders and suicides on Live, we anticipated far worse (all but one of our top 5 predictions have played out). But it still took over a year post-launch (after these horrible incidents happened) to get most of the tools that we were begging for from the start to incorporate. And all along we kept hearing that no one could have anticipated...

And once the fire happens, we're so encouraged to just solve the problem and look forward, not to look backward and point fingers. But doesn't looking backward just a bit help us figure out how not to do this again next time?

Like · Reply · 3y · Edited                                               30

Not only did you predict the Live issues, but you backed them up with examples from multiple Live platforms preceding Facebook. I'd rather we were just honest and could say, if only to ourselves, that we took a calculated risk because the upside was more important to us.

Like · Reply · 3y                                               5

34.     In short, Meta's assurances to consumers and the government were false. Meta's statements were designed to lull parents and users into a false sense of security, despite Meta's own knowledge of the harms its products were causing – which harms were not known and could not be discovered by reasonable consumers. Meta leadership knew what it was doing, but was operating under the misguided belief that they would not get caught – and but for the 2021 whistleblower, they may have gotten away with it!

35.     Meta's technologies determine the content that gets directed and/or populates its user experience on the Facebook and Instagram social media products. This includes content sent directly from Meta to its users, for Meta's own purposes, and prior to any sort of user search or request for such content. Meta knows that its algorithms are promoting and amplifying harmful content to children and teens and are operating with a degree of algorithmic discrimination that is particularly harmful to Meta's most vulnerable user groups.

36.     Meta also creates images and GIFs for users to post on videos and pictures in connection with its products. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Facebook and/or Instagram. The GIFs, images, and music are integral to the user's post and are, in fact,

designed to encourage posting. Indeed, in many cases, the only content in a user's post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. A Facebook and/or Instagram user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement, advertising revenue, and other profits for Meta itself.

37.     Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. To name only one example, in 2012, Meta revised its Instagram Terms of Service to the following,[10]

To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

38.     Meta knows that it is harming teens yet, when faced with recommendations that would reduce such harms, Meta's leadership consistently opted for prioritization of profit over the health and well-being of its teen users.

39.     Meta knows that underage users are on its platform and has deliberately designed its product in a manner intended to evade parental authority and consent, including but not limited to Meta's failure to verify age and identity, provision of multiple accounts, marketing aimed at informing minors that they can open multiple accounts, failure to provide a point of contact for parents to notify Meta of lack of consent, marketing aimed at children and that encourages children to use Meta's social media product without consent, and multiple other features and conduct by Meta aimed at ensuring young users have a means to access Meta's social media products no

---

[10] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

matter the circumstances.

40.    Lastly, Meta has developed artificial intelligence technology that detects adult users of Facebook and Instagram who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Meta with actual knowledge that a significant number of minor Meta users are solicited to and send sexually explicit photos and videos of themselves to adult users in exchange for consideration in violation of 18 U.S.C. § 1591(a)(1)–B.

41.    The Facebook and Instagram products are used by many millions of children every day, children who have become addicted to these Meta products because of its design and product features, to the point where parents cannot remove all access to these products without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention.

**B.    TikTok and its TikTok Product**

42.    TikTok is known as a video-sharing app, where users can create, share, and view short video clips, and is highly integrated with its Chinese parent, ByteDance.

43.    Known in China as Doujin, TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes. TikTok is the international version of Doujin, which was originally released in the Chinese market in September 2016. In 2017, TikTok was launched for iOS and Android in most markets outside of mainland China; however, it became available worldwide only after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

44.    TikTok has been downloaded more than 130 million times in the U.S. and it was ranked by Cloudflare as the most popular website of 2021. "TikTok was the world's most-visited website in 2021, overtaking YouTube in US watch time and Facebook in app downloads for the first time."[11]

45.    TikTok exclusively controls and operates the TikTok platform for profit, which

---

[11] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer To US Lawmakers' China Fears*, Buzzfeed, Mar. 10, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/TikTok-project-texas-bytedance-user-data

creates advertising revenue through maximizing the amount of time users spend on the platform and their level of engagement. The greater the amount of time that young users spend on TikTok, the greater the advertising revenue TikTok earns.

46. Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by TikTok's technology to show content on each user's For You Page ("FYP") based upon each user's demographics, likes, prior activity on the app, and other factors and data points known only to TikTok.

47. TikTok has designed its recommendation technologies (a/k/a algorithms) to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to user's viewing habits and interests. There are four main goals for TikTok's algorithm: which the company translates as "user value," "long-term user value," "creator value," and "platform value."

48. An internal TikTok document was leaked, which document is titled "TikTok Algo 101." This document was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention" — that is, whether a user comes back — and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

49. A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, and toward content that promotes suicide or self-harm.

50. Another article, by the New York Times, explained how TikTok markets itself as an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic

feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch … Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok." [12]

51.     On December 14, 2022, the Center for Countering Digital Hate (CCDH) published a report titled "Defective by Design," which likewise concludes and illustrates the manner in which "TikTok pushes harmful content promoting eating disorders and self-harm into users' feeds." Attached hereto as **Exhibit B** is a true and correct copy of "Defective by Design." These defects are not about third-party content, but rather, TikTok's design and programming decisions.  TikTok is targeting and inundating minors with content meant to addict them to its product, at the direct and known expense of their health and well-being.  And TikTok could make its product safer for those consumers without ever removing a single piece of content.

52.     This is confirmed by the fact that TikTok has actually designed and is programming a safer product for children in China,

> In [China's] version of TikTok, if you're under 14 years old, they show you science experiments you can do at home, museum exhibits, patriotism videos and educational videos. And they also limit it to only 40 minutes per day. Now they don't ship that version of TikTok to the rest of the world. So it's almost like they recognize that technology's influencing kids' development, and they make their domestic version a spinach version of TikTok, while they ship the opium version to the rest of the world.
>
> The version served to the west has kids hooked for hours at a time. The impact, Harris says, is predictable.
>
> Tristan Harris: There's a survey of preteens in the U.S. and China asking, "What is the most aspirational career that you want to have?" And the U.S. the number one was "Influencer."
>
> Bill Whitaker: Social media influencer.

---

[12] John Herrman, *How TikTok is Rewriting the World*, N.Y. Times, Mar. 10, 2019, *available at* https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html

Tristan Harris: And in China, the number one was "Astronaut." Again, you allow those two societies to play out for a few generations, I can tell you what your world is going to look like.[13]

53. TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok programs its systems to discourage safe challenges and encourage dangerous ones and amplifies those dangerous challenges primarily to the millions of child and teen TikTok users, that is, those most vulnerable to such harms.

54. TikTok's technologies determine the content that gets directed and/or populates its user experience on the TikTok social media product. This includes content sent directly from TikTok to its users, for TikTok's own purposes, and prior to any sort of user search or request for such content. TikTok knows that its algorithms are promoting and amplifying harmful content to children and teens and are operating with a degree of algorithmic discrimination that is particularly harmful to TikTok's most vulnerable user groups.

55. TikTok also is actively involved in the creation of certain content on its platform in a manner and to a degree of a co-creator. Specifically, after a user hits 10,000 followers and/or other benchmarks, TikTok puts them into a different "Creator" category and becomes actively involved in co-creating content with them.

56. TikTok's involvement at this point includes but is not limited to communications with creators prompting and asking them to GO LIVE, telling them what they should post and how they should post it (for example, coaching them through how to create a Story Time video and how specifically to structure those videos to leave viewers in suspense so that they will keep viewing the series), which hashtags they should use to get more views, which songs are popular and song suggestions curated to the theme of the proposed post, and other collaborative tools and communications that TikTok uses to help create and amplify content TikTok believes (based on a user's number of followers and past views) will make it money.

57. TikTok obtains PayPal information from these Creators and sends them money

---

[13] https://www.cbsnews.com/news/social-media-political-polarization-60-minutes-2022-11-06/

daily, with communications and full-screen notifications urging them to post more and to post on multiple surfaces of the TikTok product. TikTok likewise promises these Creators that it will amplify their content and promotes them based solely on Creator status. For example, TikTok will provide a Creator with more than 100,000 views in the first 24-hours of a post no matter the content of their video and due to its determination (based on followers and views) that the Creator is likely to be profitable for TikTok.

58.     These are just some examples of how TikTok operates its product to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users.

59.     TikTok markets itself as a family friendly social media application, and markets to children and teens.

60.     TikTok exclusively controls and operates the TikTok platform for profit and creates advertising revenue through maximizing the amount of time users spend on their platforms. Accordingly, while TikTok purports to have a minimum age requirement of 13-years-old, it does little to verify user age or enforce its age limitations despite knowledge that underage use is widespread. In fact, underage TikTok users will often post videos of themselves in which they clearly are not old enough to be using the TikTok social media product. On information and belief, TikTok's sophisticated algorithms can identify when a user has crooked teeth or a crack in their bedroom wall, so there is little question that those same algorithms can identify underage children in posted videos. But also, TikTok has actual knowledge of underage users.

61.     For example, in July 2020, TikTok reported that more than a third of its 49 million daily users in the United States were 14 years old or younger. And while some of those users were 13 or 14, at least one former employee reported that TikTok had actual knowledge of children even younger based on videos posted on the TikTok platform – yet failed to promptly take down those videos or close those accounts.[14] In fact, TikTok regularly knows or should know of underage users with accounts and who post videos on its platform, whether because of its algorithms, viewing by TikTok employees, and/or flagging by other TikTok users. In many such instances,

---

[14] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/TikTok-underage-users-ftc.html

TikTok does not suspend the account, require age verification, or notify the underage user's parents of such prohibited use. TikTok also has actual knowledge based on the thousands of user related data it collects and/or purchases from other websites and third parties.

62. TikTok does not seek parental consent for underage users or provide warnings or adequate controls that would allow parents to monitor and limit the use of TikTok by their children. TikTok does not verify user age, enabling and encouraging teens and children to open TikTok accounts, providing any age they want, without parental knowledge or consent.

63. Further, based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or young—18 million—was almost as large as the number of over-14 users, around 20 million. While the rest of TikTok's U.S. users were classified as being "of unknown age."[15]

64. TikTok has developed images and memes to enact images for all users to decorate the videos they post. TikTok has also developed memes and other images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. But also, TikTok actively recommends specific songs and hashtags for users based on the theme of their post, what is trending or popular, and other factors known to TikTok – but not its users – and utilized by TikTok in this manner to ensure that posts get as many views as possible—thereby increasing TikTok's engagement. When users incorporate images, memes and music supplied by TikTok into their postings (and especially when TikTok is the one approaching these users and making these recommendations), TikTok becomes a co-publisher of such content. A TikTok user who incorporates images, memes and musical content supplied by TikTok into their posts is functionally equivalent to a novelist who incorporates illustrations into her story. TikTok can no longer characterize the images, memes, and musical content it supplies to its users as third-party content as the novelist cannot disclaim responsibility for illustrations contained in her book.

65. TikTok contracts for legal rights to this third-party content, such that it is not "third-party content" at all. TikTok's current Terms of Service grant TikTok sweeping sets of rights as

---

[15] *Id.*

follows, and for example only,

> You or the owner of your User Content still own the copyright in User Content sent to us, but by submitting User Content via the Services, you hereby grant us an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute and to authorise other users of the Services and other third-parties to view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit your User Content in any format and on any platform, either now known or hereinafter invented.

66. TikTok has developed artificial intelligence technology that detects adult users of TikTok who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes TikTok with actual knowledge that a significant number of minor TikTok users are solicited to and send sexually explicit photos and videos of themselves to adult users in exchange for consideration in violation of 18 U.S.C. § 1591(a)(1)–B.

67. The TikTok product is used by many millions of children every day, children who have become addicted to the product a result of its design and product features, to the point where parents cannot remove all access to the TikTok product without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention.

**C. Defendants Designed and Distributed Inherently Dangerous and/or Defective Products to Minors and Failed to Warn**

68. Defendants' social media products contain countless features that serve no critical purpose relating to product functionality.

69. While this Complaint addresses known features, on information and belief, there are other features and technologies designed, developed, manufactured, operated, and distributed by Defendants that currently are unknown to Plaintiffs for the simple reason that Defendants have concealed the truth and operates with zero transparency. Plaintiffs believe that they will identify other examples of harmful product features and conduct through discovery in this case and, as such, it is in the interest of the State of California and this Court to permit discovery.

**Design and Distribution Decisions that Interfere with Parental Control and Consent**

22.     Defendants claim to impose age restrictions for use of their products, including that users must be at least 13 and must obtain parental consent if under 18. Nevertheless, Defendants provide access to millions of minors who are under 13 or under 18 and lack parental consent. Defendants know that they are providing unauthorized access and provide it anyway.

23.     Defendants also design their products to encourage and aid users' evasion of parental oversight—such as a self-destructing content design feature, which product feature Meta has made optional—and do not notify parents concerning the amount of time their children spend on their platforms, what hours of the day they are connected, or when they are contacted or solicited by adults. Defendants also do not verify emails or phone numbers, permit and encourage multiple accounts (with the knowledge that children use these multiple account features to hide accounts from their parents), and refuse to enforce their age limitations in any reasonable or meaningful manner.

**Profile and Accessibility Settings**

22.     Defendants' public profile settings are inherently dangerous and defective when utilized in connection with minor users.

23.     These types of settings and product features allow strangers to identify, view, and contact underage users not already on their friend list – that is, complete strangers who these children do not know in real life or even virtually. While Defendants have determined that such access to minor users is good for their engagement, they also know that they are exposing children to strangers in a manner against which parents cannot protect. Defendants could set all minor accounts to private by default or, even better, they could restrict all minor accounts to private until the user reaches the age of majority in his, her, or their state.

24.     In the event that Defendants claim to now be setting default settings to private for minor users, Defendants had knowledge that such settings were necessary and the ability to make that change prior to implementation and, regardless, any such purported safeguard is ineffective in

the absence of enforcement of age restrictions. That is, a minor can bypass any such protection by simply misstating their date of birth.

25. Public default settings are unnecessary and serve no critical purpose as to product functionality or a user's ability to access content posted by other users. They do, however, encourage and provide adult users the ability to identify and access minors for the purpose of sexual abuse and exploitation—a dangerous defect known to Defendants.

**Direct Messaging Products and Features**

26. Defendants' direct messaging products are inherently dangerous and defective when utilized in connection with minor users.

27. Defendants' direct-messaging products provide other users—including anonymous and semi-anonymous adult users, bullies under the age of eighteen, and any other stranger for whom a parent would not allow access—with unrestricted and unsupervised access to minor users. Minor users lack the cognitive ability and life experience to identify online grooming behavior by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material and mass-messaging capabilities. These products further allow direct messaging with and by minors without parental notification.

28. Defendants know or should know that these products are harming minors and opt to design and distribute for engagement regardless.

70. At all times relevant, Defendant Meta distributed their direct message products in connection with minor accounts, meaning that strangers, often adults, could directly contact and engage with minor users, without the knowledge or consent of their parents. While TikTok purports to have limited direct messaging use for users under 16 (starting sometime in 2021), such a purported safety measure is meaningless for minors who open accounts with an incorrect birthdate. These are minors. Not verifying age is the equivalent of selling children cigarettes and lottery tickets because they say that they are 18 years old – including in circumstances where any reasonable person can tell that they are younger than 18. And in this case, each of these defendants collect extensive user-related data and have technologies capable of determining the actual age of

each user with reasonable certainty.

29. Defendants' Direct Messaging products are dangerous when distributed to minors, and even more dangerous when combined with Defendants' public profile setting and user recommendation algorithms, as well as its product designs that allow for evasion of parental knowledge, consent, and control.

30. While Defendants' direct messaging products are unnecessary and serve no critical purpose as to product functionality, they are incredibly profitable in terms of engagement and retention of teen users; as well as engagement and retention of adult users who want access to vulnerable children and teens outside the purview of their parents. Defendants could restrict direct messaging products so that minor users cannot not use them, or so that they can only send or receive direct messages with persons approved by their parents and/or already on their "friend" list or equivalent. TikTok purports to have done this for users under the age of 16 sometime in mid-2021, however, N.M. is over the age of 16 and, regardless, any such safeguard would be meaningless absent some reasonable effort by TikTok to verify the age of its users.

31. Defendant Meta also provides various modes of direct messaging, including things like Live Audio and Video Chats, which further endanger minor users and make it impossible for parents to monitor their children.

### User Recommendation Products

71. Defendants employ user recommendation technologies (often referred to as algorithms), affirmatively selecting and sending recommendations to users regarding people and/or groups they should "friend," join, or otherwise connect. Meta calls its algorithm "People You May Know" (on its Facebook product) and "Suggestions for You" (on its Instagram product), and TikTok calls its algorithm "Find Friends."

72. Whatever the name, these technologies and specific products function by taking user data and other information obtained through Defendants' data collection technologies (including information such as age, gender, on-platform and off-platform activities, usage history, habits, interactions with others, and countless other data points) and then use that information to

identify and affirmatively direct users to one another via recommendations that the users connect, follow, friend, add, or otherwise.

24.     These user recommendation products are good for Defendants' engagement because they help users connect with other users with whom they otherwise would not connect.

73.     At the same time, however, these user recommendation products are dangerous *because* Defendants have opted both to utilize them in connection with minor accounts and to design, program, and operate them for engagement over safety.  Defendants' business decisions in this regard have aided, facilitated, and otherwise contributed to a significant amount of the adult/minor grooming and exploitation that has occurred on their platforms.

**Content Recommendation Products**

74.     Defendants also employ content recommendation algorithms, affirmatively flooding the Discover, News Feed, Explore, For You and other product surfaces to which they have addicted young users with content they select to habituate users to the Instagram and TikTok products.  These technologies create addiction in minor users on a content-neutral basis by adapting to promote whatever content will trigger minor users' engagement and maximize their screen time.

75.     The Instagram and TikTok products show users a "feed" – a product feature where users (often) passively are served up content and subject matters selected by the app. There are different names for these feeds, including and in some cases multiple feed products on a single app. Facebook, for example, has its News Feed, as well as Watch, Reels, and Stories, among others.

76.     These feeds generally are comprised of a series of photos and/or videos posted by accounts that the user follow or may know or that are suggested by Meta or TikTok, as well as advertisements promoted by Meta and TikTok. In some cases, a user can skip past the advertisements, but in some cases they cannot.  And in all cases, Meta and TikTok exert complete control over a user's feed, including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Defendants based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. Meta and TikTok determine and program the goals for each

of their respective algorithms, as well as the speed at which they will operate the algorithm on each user, how much they will crank up engagement, work to hook each user, and similar. In other words, each of these defendants are programming and designing their own targeted advertisements and algorithms in a manner that is causing harm to millions of its users, and know or should know of these harms, but have stayed the course regardless and to accomplish their goal of increasing engagement at any cost.

77.     Moreover, TikTok actively involves itself in the creation of a significant amount of content it shows to minor users – specifically, Creator content. Creators are TikTok users who have amassed a certain number of followers or views and at the point where they hit TikTok's benchmark, TikTok takes an even more active interest in their activities and begins encouraging, asking, and/or telling them to post, promoting their content as a matter of course, paying them to post, providing them with exclusive tools, reminding them to post, and even coaching them on what hashtags to use, which music to incorporate, and how to make their videos more engaging so that viewers keep coming back for more. In short, TikTok becomes a co-creator in every sense of the word, based on its assessment that it can increase engagement through specific users.

78.     Defendants' programming decisions and product designs promote harmful connections and content, ranging from massive amounts of negative social comparison to shocking and outrageous hate speech, pornography, child and animal abuse, and even live suicides and/or the glorification of suicide and self-harm among children and teens. Defendants are aware of the impact their programming decisions are having on their youngest users, they simply do not care enough to prioritize user safety over their own revenue and growth objectives.

79.     Defendants could make their products exponentially safer for children, teens, and young adults through any number of quick and inexpensive changes. To name only a few examples,

       a.   Defendants currently programs their recommendation technologies to prioritize engagement but could program those technologies instead (either generally or specific to accounts used by minors) to prioritize safety.

b. Defendants could slow, restrict, or even stop entirely their use of recommendation technologies in connection with minor accounts, any one of which would significantly reduce harms to minor users at nominal cost to Defendants.

c. Defendants could collect less or different data from minor users and/or utilize less or different data in connection with minor users, which unilateral changes would significantly reduce harms to minor users at nominal cost to Defendants.

d. Defendants could stop approving harmful advertisements and/or restrict or limit the types and frequency of advertisements they direct to minor users, which unilateral changes would significantly reduce harms to minor users at nominal cost to Defendants.

80. Defendants' content recommendation technologies serve no countervailing benefit to consumers. Users are perfectly capable of running their own searches, as they do with any number of available search engines. And if the harmful third-party content were being provided in that manner – *i.e.* if this was content requested and sought out by users as opposed to content identified and force fed to users as means to make Defendants more money – it would not be at issue in this case

81. Defendants are exerting a degree of manipulation and control over their users via their unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. Defendants are not targeting millions, thousands, or even hundreds of users in this manner. Instead, their technologies allow them to target every single user simultaneously and on an individual basis, which fact makes their algorithmic and social media products far more dangerous than other products. Additionally, Defendants' programming decisions are aimed to encourage and cause dependencies and harmful levels of use of their products.

## Push Notifications and Emails

82. Defendants' push notifications and emails encourage addictive behavior and are designed specifically to increase use of their Instagram and TikTok products.

83. Push notifications are clickable, pop-up notifications that Defendants "push" to users after they have logged off their products, and specifically to pull them back and persuade them to continue using. Defendants have put significant time and thought into the wording of those notifications, designing and re-designing them over time and to make them more effective. A former developer outlined that "the vast majority of push notifications are just distractions that pull us out of the moment… They get us hooked on pulling our phones out and getting lost in a quick hit of information that could wait for later, or doesn't matter at all."[16]

84. Defendants also target young users with email and other forms of communication, where they have access to such information.

85. Defendants' notifications to individual users are specifically designed to, and do, prompt them to open Defendants' social media products and view the content Defendants select, thereby increasing sessions and profits to Defendants. Defendants draft and decide on the language of these notifications. More to the point, the have even designed and re-designed the format of their notifications with the specific purpose of pulling users back onto the social media platform— irrespective of a user's health or wellbeing. For example, instead of telling a user what someone on their "friends" list said, Defendants will create and push a vague and enticing message to the user to maximize the likelihood that the user will log back onto its product. Defendants create and send messages like "There are comments on [your friend]'s post you may have missed." The wording of these notifications is deliberate.

86. Defendants target young users with these notifications and send them to young users at all hours of the day and night – including during school and sleeping hours, when those notifications cause the most harm. The average American consumer, for example, receives an estimated 56 push notifications each day[17] while (on information and belief) Defendants send more

[16] Justin Rosenstein, co-creator of Facebook's Like Button, in Julian Morgans 2017 "The Secret Ways Social MediaIs Built for Addiction" Vice https://www.vice.com/en/article/vv5jkb/the-secret-ways-social-media-is-built-for-addiction

[17] See Martin Pielot, Amalia Vradi, and Souneil Park. 2018 "Dismissed! A detailed exploration of how mobile phone users handle push notifications" Proceedings of the 20th International Conference on Human-Computer Interaction with Mobile Devices and Services https://doi.org/10.1145/3229434.3229445; see also Olivia Rudgard 2022 "Stop sending children social media notifications during the night, says privacy expert" The Telegraph https://www.telegraph.co.uk/news/2018/03/22/stop-sending-children-social-media-notifications-night-says/.

of these notifications to minor users than they do to the average American consumer.

**Marketing to Kids, Social Comparison, and Other Addictive Product Features**

87.     Defendants Meta and TikTok incorporate several unique product features that serve no functional purpose, but that do make their products more appealing to children and teens (*i.e.*, "likes" and filters, avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters).

22.     One example involves extensive testing Defendant Meta performed on its "like" button feature. Meta determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[18] What is surprising, however, is that Meta identified the harmful feature (the "like" button) and ran experiments (called "Project Daisy") to see whether hiding the feature completely (called, "Pure Daisy") would reduce the harms, found that it would in fact reduce the harms and in statistically significant numbers when it came to teen users, then made the business decision to <u>*not*</u> launch Pure Daisy for fear that hiding "likes" would result in lower engagement and anger advertisers. Meta leadership chose profit over the health and well-being of teens.

23.     Instagram and TikTok also are designed around a series of features that do not add to the communication utility of the applications, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards. Examples of this in the Facebook and Instagram products include but are not limited to features like "likes," "followers," algorithm-controlled feed, and unlimited scrolling features; examples of this in the TikTok product include but are not limited to likes, followers, algorithm-controlled feed, endless loop, and auto-play features.

88.     Defendants have spent billions to manipulate and addict young users via these

---

[18]*See*, *e.g.*, https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

extended use designs, as well as user interface designs and dark patterns. These designs are aimed at persuading users into making choices that undermine their own best interest.

24.     Each of the above products, design, distribution, and programming decisions are dangerous alone, but they are substantially more dangerous when combined.

25.     Defendants deliberately designed their products this way to increase engagement; employed invasive, surreptitious means to operate these technologies; failed to warn users or their parents of these dangers known only to Defendants; and refused to restrict their use of these products in connection with minors' accounts or otherwise make these products safe, despite knowledge of the harms perpetrated on American youth in general and on Plaintiffs in particular. The cost of designing safer products and fixing known defects is negligible. In fact, each of the above examples could be addressed in a matter of hours, not days. These products serve no purpose for consumers, and the benefit of making the necessary changes would be high in terms of reducing the quantum of mental and physical injury sustained by minor users and their families.

**D.     Young Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Technologies with Diminished Capacity to Eschew Self- Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

89.     The human brain is still developing during adolescence in ways consistent with demonstrated psychosocial immaturity of adolescents. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

90.     The frontal lobes - and in particular the prefrontal cortex - of the brain play an essential part in higher-order cognitive functions, impulse control and executive decision- making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

91.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting

different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning" - the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and continues into young adulthood.

92.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. The part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

93.    Defendants' social media products are designed to exploit the diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by the incomplete brain development of minor users. Defendants know that because its minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design the Instagram and TikTok products with any protections to account for and ameliorate the psychosocial immaturity of its minor users.   On the contrary, Defendants have designed its products to exploit these vulnerabilities at the expense of its users and for Defendants' own financial gains.

**E.    The addictive and inherently dangerous nature of Defendants' products and its complex and psychologically manipulative designs are unknown to ordinary users**

94.    Defendants do not warn users of its addictive designs and product features, of its inherently dangerous products, or its programming decisions and the harms those decisions cause to a significant number of Defendants' child, teen, and young adult users.   On the contrary, Defendants actively have concealed conceal the dangerous and addictive nature of its product, lulling users and parents into a false sense of security.

95.    This includes consistently playing down its product's negative effects on teens in

public statements and advertising, making false or materially misleading statements concerning product safety, marketing Instagram and TikTok as a family application that is fun and safe for all ages, and refusing to make its research public or available to academics or lawmakers who have asked.

96.     During the relevant time period, Defendants stated in public comments that the Instagram and TikTok products are not addictive and was not designed to be addictive. Defendants knew or should have known that those statements were untrue.

97.     Defendants knew or should have known that it was designing its products in an inherently dangerous way prior to when it began marketing and distributing to children in the U.S. Defendants did not invent these addictive designs and manipulation techniques, which were around several years prior – Defendants simply weaponized them for purposes of its social media product

98.     In 2016, former Google designer Tristan Harris spoke out publicly, explaining how social media companies and their designs were borrowing from addictive design mechanisms that had been around for years; and in 2017, Meta's first President Sean Parker summed up the devastating impact of these designs, and admitted to the fact that social media companies like Meta and TikTok knew what they were doing all along,

> God only knows what it's doing to our children's brains. The thought process that went into building these applications, Facebook being the first of them, ... was all about: "How do we consume as much of your time and conscious attention as possible?" And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you ... more likes and comments. It's a social-validation feedback loop ... exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people — understood this consciously. And we did it anyway.[19]

99.     Defendants did not warn users or parents of the addictive and mentally harmful effects, connections, and exposures that the use of its product was causing amongst minor users.

---

[19] Mike Allen, Sean Parker unloads on Facebook: "God only knows what it's doing to our children's brains", Axios (November 9, 2017), https://www.axios.com/2017/12/15/sean-parker- unloads-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains-1513306792.

100.     Defendants knew or should have known that its product was dangerously defective and in need of immediate and significant change to prevent users, especially children, from becoming addicted to Instagram and TikTok, and, also, from being directed to harmful content that was identified by Defendants and known to Defendants to be harmful.

101.     Defendants knew or should have known that a failure to take immediate and significant corrective action would result in an unreasonable and unacceptable risk and that American children would be seriously and irreparably harmed.

102.     Despite this knowledge, Defendants continued to make misrepresentations about the safety of its product and its own efforts to keep kids safe on its social media platform, while then failing to take such actions to protect minor users – but instead, Defendants continued to operate its algorithms in an inherently dangerous and harmful manner.

103.     Despite this knowledge, Defendants failed to change, update, and/or correct its product to prevent it from directing users, specifically children, to harmful and outrageous content, despite knowing that such a failure would inevitably lead to user harm.

104.     Defendants failed or refused to take the necessary corrective action to cure its defective product because it knew that such fixes would result in less user engagement and, thus, less profits.

105.     Defendants prioritized greater corporate profits over the health and safety of its users and, specifically, over the health and safety of vulnerable children Defendants knew or should have known were actively using its social media product.

106.     Plaintiffs believe that discovery against Defendants will reveal countless additional documents that support these allegations, and multiple examples of known and foreseeable harms Defendants are causing young users in the interest of corporate greed – otherwise referred to as growth and engagement. Defendants prioritized growth and engagement over the health and well-being of its users including, specifically, Plaintiffs in this case.

**F.    Defendants Knowingly Operate Their Product with a Harmful Degree of Algorithmic Discrimination**

107.    Meta and TikTok knowingly identify and connect young users to dangerous content via their proprietary technologies and product features; and have chosen to distribute their products despite the fact that their products operate in a discriminatory manner – referred to as algorithmic bias or discrimination.

108.    At all times relevant, Meta and TikTok's technology was designed to identify and amplify users and content selected by Meta and TikTok's algorithm not because of user request or desire to meet those other users or see such content, but to manipulate users for the purpose of increasing engagement and growth. To accomplish this, Meta and TikTok programmed and/or allow their technology to direct harmful connections and content to protected classes in significantly greater numbers.

109.    Meta and TikTok are targeting millions of U.S. teen girls with disordered eating and self-harm content, as well as deliberate exposure and connections to predatory users.

110.    Meta and TikTok serves up and connects young female users to substantially more predatory users than it does their male and adult counterparts.

111.    Meta and TikTok directs more harmful social comparison, disordered eating, and self-harm content to young female users than any other user group.

112.    Meta and TikTok know or should know that their algorithms are operating with bias and discrimination, disproportionality harming users based on protected characteristics.

**G.    Plaintiffs Expressly Disclaim Claims Seeking to Hold Meta and TikTok Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

113.    Plaintiffs seek to hold Meta and TikTok accountable for their own alleged acts and omissions. Plaintiffs' claims arise from Defendants status as designers and marketers of dangerously defective products (including but not limited to their patented technologies, processes, and the multitude of tangible devices Defendants utilize and require for operation of their social media platform), as well as Defendants' own statements and actions, and are not based on Defendants as the speakers or publishers of third-party content.

114.     Defendants also failed to warn minor users and their parents of known dangers arising from anticipated use of their products. These dangers, which are unknown to ordinary consumers, do not arise from third-party content contained on the Instagram or TikTok social media products, but rather, from Defendants' product designs that 1) fail to verify age, identity, and parental consent (in the case of minors); 2) addict minor users to the Instagram and TikTok products; 3) affirmatively identify and direct harmful connections and content to vulnerable users based on their individualized demographic data and social media activity, and for the purpose of the revenue Defendants makes from sending such harmful connections and content to minor users (via increased engagement, but also, advertising revenue); and 4) exposes minor uses to adult users via product features that include but are not limited to direct messaging and public profile settings.

115.     Defendants further design and operate their algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

116.     Defendants' product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Defendants' platforms, as described in more detail above.

117.     Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' products.

118.     Defendants have information and knowledge that can determine with reasonable certainty each user's age, habits, and other personal information, regardless of what information is provided at the time of account setup. In other words, Defendants know or should know when a user claims to be 31 but is really 13 and, likewise, when a user claims to be 13 but is really 31.

119.     In short, Plaintiffs' claims do not rely on treating Defendants as the publisher or speaker of any third-party's words or content. Plaintiffs' claims seek to hold Defendants accountable for Defendants' own allegedly wrongful acts and omissions, not for the speech of others or for Defendants' good faith attempts to restrict access to objectionable content.

120.     Plaintiffs are not alleging that Defendants are liable for what third parties said or

did, but for what Defendants did or did not do, nor are Plaintiffs seeking any form of relief that would require Defendants to monitor, remove, or censor third party content.

121. Plaintiffs seek to hold Defendants liable for their own speech and their own actions and decisions, as well as for their own silence in failing to warn of foreseeable dangers arising from anticipate use of their social media products. Defendants could manifestly fulfill their legal duty to design reasonably safe social media products and furnish adequate warnings of foreseeable dangers arising out of the use of Defendants' products without monitoring, altering, deleting, or modifying the content of a single third-party post or communication.

## V. PLAINTIFF-SPECIFIC ALLEGATIONS

122. Plaintiff N.M. is 17 years old.

123. N.M. was a happy and fiercely intelligent child. She always enjoyed and did well in school and sports and dreamt of attending college on a field hockey scholarship and studying to become a pediatrician. N.M. was not just good at field hockey she excelled at it.

124. N.M. got her first cell phone in 8th grade, after saving up and purchasing it herself. She was active in sports, a straight-A student, and a responsible individual who had given her parents no reason to think that she could not handle the responsibility of a cell phone.

125. Her parents did, however, discuss with her the importance of safety, of not sharing your information with strangers, and of being careful what you post with the knowledge that once you put something out there you can never take it back.

126. One of the first things N.M. did after purchasing her phone was to open an Instagram account. It seemed like all of her friends already had Instagram, and N.M. opened the account to keep in touch and communicate with her friends and family members. Then, in or around late 2019, N.M. opened a TikTok account.

127. N.M.'s use of the Instagram and TikTok social media products coincided with a steady and severe decline in her mental and physical health.

128. N.M. was not looking for, did not she want, fitness, weight loss, exercise, or any similar content or advertisements from Meta and TikTok. She was athletic, engaged in several sports, and had a good sense of self and self-esteem – then Instagram and TikTok happened.

129.     Meta sent N.M. push notifications 24-hours a day, designed to and that did persuade her to log back on to the Instagram app every time she tried to log off.

130.     Within a matter of months, N.M. found herself regularly checking her Instagram at night, at first in response to push notifications Meta sent her and, eventually, as a matter of habit. She intended to spend only a few minutes on the product but would get lost in Meta's endless scroll and other extended use product features, lose track of time, and ultimately spend hours passively viewing content on the app – causing a lack of sleep, anxiety, and depression.

131.     Within a matter of months, N.M.'s posting experience also changed, going from something she enjoyed to something she obsessed over and, at times, dreaded. N.M. worried relentlessly over the number of likes, comments, and shares her posts received, would check her account multiple times after posting, and would remove posts if she felt they did not garner enough responses. Meta's products created a perfect storm of social comparison, which left N.M. feeling anxious, vulnerable, and often unsure or insecure about herself. These harms were caused specifically by Meta's product designs, which harms Meta knew about and opted to inflict on a significant number of Instagram users (specifically, teen girls) to ensure increased engagement.

132.     And over the course of those first few months, Meta began selecting and connecting N.M. with harmful users and content.   This included random strangers who Meta would recommend to N.M. via its Suggestions for You user recommendation algorithm as well as random strangers who were somehow about to find N.M.'s profile and direct message her even though she was a minor with a profile to private.   These product features were either defective or inherently dangerous in that they were serving up minor N.M. to predatory, adult users.

133.     Meta likewise began selecting and connecting N.M. to massive amounts of advertising that made N.M. feel like she wasn't pretty enough or skinny enough – at first, this included makeup advertisements, then it became advertisements for workout products, exercise products, and fat burning and/or low-calorie food products. These were advertisements Meta either directly approved or assisted in the creation of, then purposefully targeted at N.M. due, at least in part, to her age, gender, and other perceived vulnerabilities, and from which Meta profited each time.   N.M. did not search for these product advertisements and did not understand why Meta was

targeting her with them, however, she then began asking her parents to buy these products.

134. Meta also then started targeting N.M. with large amounts of Health & Beauty connections and content, including influencer and other third-party videos focused solely on health and beauty, and similar subject matters. These were subject matters N.M. did not search for and did not want, but that Meta began pushing to her Explore and other app surfaces in excessive amounts each time she opened Instagram. As with the advertisements Meta directed to N.M. via its product design and programming decisions, Instagram began by targeting her with bathing suit photos and videos, then cooking recipes and ideas, and over time, Meta started filling her feed surfaces with overly skinny models, more make-up products, and diet products and tips.

135. Meta targeted N.M. via its product design and programming based on her age and gender, and the decisions Meta made for N.M. caused incredible harm, including but not limited to harmful social comparisons, depression, anxiety, and, eventually, disordered eating as N.M. began buying the products and following the diets Meta told her she should buy and follow.

136. Like Meta, TikTok also sent N.M. push notifications 24-hours a day, designed to and that did persuade her to log back on to the TikTok app every time she tried to log off.

137. N.M. found herself opening and re-opening her TikTok app regularly and at all hours due to extended use designs utilized by TikTok, including not limited to auto-play, endless scroll, and time manipulation techniques. What N.M. meant to be a few minutes on TikTok almost always turned into hours, which developing dependency led to increased sleep deprivation, anxiety, and depression.

138. N.M. began watching TikTok for its cute dance videos, but within a matter of months – if not quicker – the TikTok algorithm product also began to turn deadly. Like with Instagram, TikTok started by flooding N.M.'s For You Page with advertisements for makeup and health and beauty brands. Then it began sending N.M. skinny influencer content, encouraging and pushing her to try new workout routines – which, ultimately, she did; then TikTok targeted N.M. with extreme content like "What I Eat In a Day" and dangerous workout routines.

139. TikTok also materially contributed and participated in the creation of most if not all of the influencer (referred to by TikTok as "creator") content it then directed to N.M., including

by encouraging and paying those creators to post more, telling them where to post, when to post, and how to post, providing them with tutorials and coaching them on how to get more views and make their posts more interesting, suggesting songs to match their themes, and other tools, communications, and actions in which TikTok routinely engages specifically with those users its refers to as Creators in order to make more money via engagement.

140. When N.M. opened her TikTok account, she provided her actual birthdate. TikTok had actual knowledge at all times that it was directing these advertisements, creator content, and other harmful subject matters to a minor. Meta also knew or should have known that N.M. was a minor, including based on information it had in its possession, its age estimating technologies, and N.M.'s stated birth year, which – while not accurate – still identified her as a minor when Meta's products began targeting her with harmful advertisements, connections, and subject matters.

141. Shortly after the pandemic began is when N.M.'s parents noticed that something was wrong. N.M. was home more due to quarantining and was engaged in more physical activities than usual. At first, her parents thought it was boredom, but then they noticed that she was losing weight and no longer enjoyed social situations. Specifically, she began focusing on calories, limiting the times she could eat, and asking for special foods with a precise degree of knowledge she should not have had. N.M. was being fed an arsenal of very specific information about foods, eating, and exercise, and despite her parents' diligent efforts to find out the source, they could not.

142. To N.M.'s parents it felt like someone else had come into the picture and was significantly influencing their child – who was changing before their eyes – but they could not figure out who, how, or why. This is one of the greatest harms Meta and TikTok have caused to users, families, and medical providers. Specifically, they concealed the harms only they knew their products were causing, which harms related to their product design decisions, programming, distribution, and operational choices within their sole knowledge and control. N.M.'s parents could have intervened and obtained N.M. the help she needed sooner and before the worst of the damage was done had these companies simply come forward and told users and their parents the truth.

143. In September of 2021, N.M.'s mother, Elizabeth, took her to the doctor to get checked out. The doctor said that something was wrong; that N.M. was not getting enough calories,

but that it was not out of control and her parents needed to start supervising her at meals.

144. N.M. was then sent to an eating disorder specialist in the practice three days later, and N.M. parents noted the sharp decrease in her BMI, which coincided with the period of increase in her use of the TikTok product.

145. Elizabeth then made the difficult decision to pull N.M. out of the private high school she was attending, so that she could better monitor and help her daughter get better – including by being able to bring her home at lunch each day to eat. This was the high school N.M. and her parents chose because of the opportunities it offered for her future, including a global exchange program through which N.M. planned to spend a semester in Ireland and specialized introduction to a medical career courses N.M. wanted to take in preparation for becoming a doctor. N.M.'s parents sent her to this private school for these specific opportunities, but then had to move N.M. another school instead.

146. N.M. also participated in a field hockey league in preparation for a college scholarship, which cost approximately $800 per session, and eventually she had to quit the league and competitive playing due the harms caused to her by the Meta and TikTok products.

147. Unfortunately, N.M. did not get better. What Elizabeth did not know and had no way of knowing at that time, even in the exercise of reasonable diligence, was that Meta and TikTok were causing the harms to her daughter; that N.M. was dependent on their products and that they were fostering, connecting, and enabling harmful connections for their own gain.

148. Meta and TikTok were targeting N.M. on the basis of gender and other perceived vulnerabilities, while at the same time marketing themselves as fun and safe products for teens. Meta and TikTok knew about the harms their products and programming decisions were causing and made the calculated business decision to keep the rest of the world in the dark – and millions of American children, including N.M. were harmed as a result.

149. In or around January 2022, N.M. was getting ready to leave for a Field Hockey finals game when she began having chest pains. Elizabeth took her to urgent care, thinking it was a muscular issue. Instead, urgent care rushed N.M. to the hospital where she was admitted for a week with an extremely low heart rate and a diagnosed eating disorder.

150.     Shortly after N.M. was admitted to the hospital, Elizabeth went home to grab some things and quickly returned. When she returned, N.M. was in tears. She asked her mother how her phone knew what she was doing and said that she felt like someone was watching her. Then she showed her mother her TikTok For You Page and the videos TikTok had only just started aiming at her – which videos were focused on how she could convince doctors that she was eating and that she did not need to be sent away for treatment.

151.     This included things like encouraging her to drink water before a weigh-in and other tips and tricks. N.M. had never received these videos on the TikTok product before, but TikTok began sending them moments after she was admitted to the hospital and left in her hospital room.

152.     TikTok and Meta collect thousands of data points on every user, from device ID to browser history, IP address, estimated age, education, consumer preferences, health history, and other categories that are incredibly invasive and inherently harmful – particularly given the manner in which these defendants choose to use that information. While it is unknown how precisely TikTok determined that N.M. was in the hospital and seeking treatment for her eating disorder, TikTok knew and decided to target her with specialized subject matters aimed at helping her hide the eating disorder TikTok helped cause in the first place.

153.     N.M. was eventually released, began intensive therapy, and was hospitalized again three months later, in April 2022. This time, she was admitted to a facility that made clear things were now out of her parents' hands; that the level of care she would need if she did not make more progress would require a rehabilitation facility. N.M. committed to making more progress and was allowed to return home, where she is still working to stay in recovery.

154.     N.M. wanted to be a doctor since she was little, and planned to attend college on a sports scholarship, which she was well positioned to obtain before she began using the Instagram and TikTok products and was targeted by Meta and TikTok.

155.     As a proximate result of her compulsion to interact with the Instagram and TikTok products, and specifically due to recommendations and content Meta and TikTok selected and showed to N.M., a minor user of their products, N.M. subsequently developed injuries including, but not limited to, social media compulsion, sleep deprivation, anxiety, depression, body

dysmorphia, and an eating disorder, among other harmful effects, which may cause or contribute to additional harms.

156.     Defendants have designed their products to frustrate parents like Elizabeth from exercising their rights and duties as parents to monitor and limit their children's use of Defendants' products.

157.     Defendants have designed their products to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Elizabeth.

158.     Defendants have designed their products to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access Defendants' products.

159.     N.M. and Elizabeth were not aware of the addictive and mentally harmful effects of Defendants' Instagram and TikTok products when N.M. began using those products. Defendants not only failed to warn them of the dangers of social media compulsion, sleep deprivation, and problematic use of Defendants' products, but misrepresented the safety, utility, and non-addictive properties of their products. Executives at both Meta and TikTok made public statements about the safety of their products and testified under oath before the U.S. Senate as to the same – despite actual knowledge of the harms their products were causing, including and specifically the harms at issue in this Complaint.

160.     To name only one example, Defendant Meta knew of the dependencies it was causing in minor users as early as 2017, while the same year, Meta found and CEO, Mark Zuckerberg published a manifesto extolling the safety and security of Meta's products. Likewise, in 2019 and 2020, TikTok spent millions convincing the American public via a wide-spread advertising campaign that TikTok was a fun and safe product, appropriate for families and children.  Defendants did not warn N.M. or her parents and they reasonably relied on Defendants' representations and complete lack of product warnings.

161.     As a result of N.M.'s extensive and problematic use of the Instagram and TikTok products she developed numerous mental and physical health conditions.  The long-term physical harms caused by her anorexia remain unknown, but she has been informed by doctors that it is

possible her long-term health will suffer, including but not limited to things like bone density, her ability to have children, and heart health.

162. N.M. can no longer actively compete in any type of sport and her ability to exercise at all is limited due to a heart condition caused by the anorexia; she has lost large amounts of hair and the doctors do not know when that will grow back; and she suffers from anxiety, depression, and social anxieties she did not have before her use of Defendants' products.

163. N.M. still plans to go to college and was able to bring her grades back up from the hits they took during her periods of hospitalization – but her dreams of attending a top tier college with a sports scholarship were destroyed when Meta and TikTok weaponized their products and exploited her for their own gain.

164. N.M.'s parents have likewise been harmed, both physically due to the stress arising from the harms that happened to their child and financially. Elizabeth has suffered stress-related changes to her health and physical harms due to a disease that was in remission until the above-described incidents occurred. N.M.'s parents spent more than $15,000 in unreimbursed therapy and training, more than $50,000 in private school tuition for benefits that were lost when N.M. had to be removed from that school, and years of pain and suffering as they watched their child being harmed by an intruder that they could not discover despite extensive efforts to get the help N.M. needed. These are just a few of the harms Meta and TikTok caused.

## VI. PLAINTIFFS' CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

165. Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully stated herein.

166. Defendants' social media products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition and its defective

condition was a cause of Plaintiffs' injuries.

167.     Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products cause mental and physical harm to minor users.

168.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to users but are unreasonably dangerous and implemented by Defendants solely to increase the profits derived from each additional user and the length of time Defendants could keep each user dependent on their products.

**A.     Inadequate Safeguards from Harmful and Exploitative Content**

169.     As designed, Defendants' technology products are not reasonably safe because they affirmatively identify and direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable children from such harmful exposures. It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. That is, Defendants can simply not target and bombard minors with harmful content, or they could not use their patented technologies on minors at all and, instead, provide their minor users with the ability to choose their own content. The cost of these safeguards would be negligible (a few hours of programming perhaps) while the benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families because of Defendants' products.

170.     Defendants also engage in conduct, outside of the algorithm technologies themselves, which is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content

is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user well-being.

171. Reasonable users (and their parents) would not expect that Defendants would knowingly expose them to such harmful content and/or that Defendants' product would purposefully direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continues to knowingly use its technologies on users in a manner designed to affirmatively change user behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

172. Outrageously, Defendants knowingly exposes the public and innocent children to addiction, manipulation, and control causing them to engage in the harmful behaviors promoted by the dangerous and deadly content Defendants serves to them.

173. Defendants knew that dangerous and inherently harmful videos, advertisements, and other content were circulating via its social media product and was being recommended to users by the Defendants' algorithm, including through users' FYP and Explore pages, among other product surfaces. In fact, Defendants were encouraging the creation of such content through its algorithmic programming and programming its technologies to target minor users, as well as, in the case of Defendant TikTok, by actively urging, encouraging, helping, and paying more popular users to post more so that TikTok could make more money from such co-created content.

174. Defendants knew that children were developing severe mental and physical health conditions because of their addiction to Instagram and TikTok and Defendants' decision to expose them to harmful content and adult users. Defendants stayed the course regardless, and in the interest of corporate profit.

**B. Failure to Verify Minor Users' Age and Identity**

175. As designed, Defendants' products are not reasonably safe because Defendants do not provide for adequate age verification by requiring users to document and verify their age and identity.

176. Minor users who are under the age of 13 often open and/or access Defendants accounts, and Defendants knows or has reason to know when a user is underage. Defendants

already have the information and means they need to ascertain with reasonable certainty each user's actual age and, at least in some cases, Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. Defendants simply then chooses to do nothing about that information as it relates to the specific, underaged users themselves and/or actively directs harmful content to these underage users to keep them engaged.

177.    Defendants have actual knowledge of users under 13, including because it is clear from videos that they are too young to legally be using Defendants' social media products as well as from the massive amounts of data they collect and their own algorithms and technologies. Despite such knowledge, Defendants often are slow to act or do not act at all, in the interest of increased profits.

178.    Moreover, reasonably accurate age and identity verification is not only feasible but widely deployed by on-line retailers and internet service providers.

179.    The cost of incorporating age and identity verification into Defendants' products would be negligible whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C. Inadequate Parental Control and Monitoring**

180.    Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

181.    Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D. Intentional Direction of Minor Users to Harmful and Exploitative Content**

182.    Default "recommendations" communicated to new teen and pre-teen users, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

183.    Ad content pushes new teen and pre-teen users because of their age and

vulnerability, purposefully steers those users toward content Defendants know to be harmful to children of their age and gender.

**E. Design of Addictive Social Media Products**

184.    As designed, Defendants' social media products are addictive to child users as follows: When minors use design features such as "likes" it cause their brains to release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological base line to trigger minor users' dopamine responses increases, they continue to use Instagram and TikTok, not for enjoyment, but simply to feel normal. Once they stop using Instagram and TikTok, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

185.    Addiction is not restricted to a substance abuse disorders.  Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

186.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is

discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

187.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is.  Addictive social media use is manifested when a user (1) becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in order to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

188.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

189.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

     a.    You spend a lot of time thinking about social media or planning how to use it.

     b.    You feel an urge to use social media more and more.

     c.    You use social media in order to forget about personal problems.

     d.    You have tried to cut down on the use of social media without success.

     e.    You become restless or troubled if you are prohibited from using social media.

     f.    You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

190. Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

191. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

   a. Tolerance, the need to spend more time using social media to satisfy the urge.

   b. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

   c. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

   d. Continuing to use social media despite problems.

   e. Deceiving family members or others about the amount of time spent on social media.

   f. The use of social media to relieve negative moods, such as guilt or hopelessness.

   g. Jeopardized school or work performance or relationships due to social media usage.

192. Defendants' advertising profit is directly tied to the amount of time that Defendants' users spend online, and Defendants' algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically

and neurologically addictive.

193. It is feasible to make Defendants' product less addictive to child users by limiting the frequency and duration of access and suspending service during sleeping hours.

194. Designing software that limits the frequency and duration of child users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms of self-harm among this vulnerable age cohort.

**F. Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

195. Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants know to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable.

196. It is reasonable for parents to expect that social media products that actively promote their platform to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive. It is feasible for Defendants to design a product that identifies a significant percentage of their minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

197. Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users. Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

198. It also is reasonable for parents to expect that platforms such as Instagram and

TikTok, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

199.     As a proximate result of these dangerous and defective design attributes of Defendants' products, Plaintiffs suffered severe harms. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective designs in Defendants' products until late 2021 at the soonest, which is when the Facebook whistleblower came forward and the truth regarding how these social media products are designed, distributed, programmed, and operated finally came to light. This is information Defendants concealed for years.

200.     As a result of Defendants' negligence, Plaintiffs have suffered emotional distress, past and future medical expenses, and pain and suffering.

201.     Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of the Instagram and TikTok social media products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through use of Instagram and TikTok.

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

202.     Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully stated herein.

203.     Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by their products could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the products not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold and was a proximate cause of the harm to Plaintiffs.

204.     Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Instagram and

TikTok.

205. Defendants' social media products rely on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media platforms are physically and/or psychologically addictive.

206. The magnitude of harm from addiction to Defendants' products are horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, eating disorders, accidental death, and suicide.

207. The harms resulting from minors' addictive use of social media platforms have been not only well- documented in the professional and scientific literature, but Defendants had actual knowledge of such harms.

208. Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to children's mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

209. It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

210. Defendants knew about these harms, knew that users and parents would not be able to safely use the Instagram and TikTok products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

211. As a proximate result of Defendants' failure to warn, minor Plaintiff N.M. suffered severe mental harm, leading to physical injury from her use of Instagram and TikTok.

212.    As a result of Defendants' failure to warn, Plaintiff Elizabeth Mullen has suffered emotional distress and pecuniary hardship due to her child's mental harm resulting from social media addiction.

213.    Defendants are further liable to Plaintiffs for punitive damages based upon Defendants' willful and wanton failure to warn of known dangers of the Instagram and TikTok products, which were intentionally marketed and sold to child users, whom Defendants knew would be seriously harmed through their use of the Instagram and TikTok social media products.

## COUNT III – NEGLIGENCE

214.    Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully stated herein.

215.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products.

216.    Defendants owe a heightened duty of care to minor users of its social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters and much more susceptible to dangerous content identified and amplified by Defendants.

217.    As a product manufacturer marketing and selling products to residents of and across the United States, and including in California, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

218.    As a business owner, Defendants owe its users who visit Defendants' social media platforms and from whom Defendants derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees.

219.    Defendants had a duty to not identify and direct dangerous and deadly videos and

challenges to minors. Defendants benefited directly and substantially from its continued promotion and amplification of this harmful content, knew the content was harmful, and knew it was benefiting in this manner.

220. Defendants also had a duty to not program its algorithm in a manner that it knew or should have known would identify and direct vulnerable children to dangerous and deadly videos and challenges, including but not limited to videos about eating disorders, self-harm, and suicide.

221. Defendants each had a duty to employ and train personnel to appropriately and reasonably respond to notice that harmful eating disorder and self-harm promoting content was being advertised and identified, posted, and/or directed to minors on Defendants' app.

222. Defendants each had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate its app and algorithms to ensure that it did not manipulate users and/or otherwise encourage them to view and engage with such harmful eating disorder and self-harm promoting content.

223. Defendants each were negligent, grossly negligent, reckless and/or careless in that it failed to exercise ordinary care and caution for the safety of underage users.

224. Defendants each were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of its product and levels of problematic use amongst child users. Defendants have extensive internal research and/or documents and communications indicating that its product is harmful, causes extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

225. Defendants each were negligent in failing to provide adequate warnings about the dangers associated with the use of its social media products and in failing to advise users and their parents about how and when to safely use its social media platform and features.

226. Defendants each were negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram and TikTok products.

227.    Defendants each were negligent in failing to provide users and parents the tools to ensure that its social media product is used in a limited and safe manner by underage users.

228.    As a proximate result of Defendants' negligence, minor Plaintiff N.M. suffered severe mental harm from their use of Instagram and TikTok.

229.    As a proximate result of Defendants' negligence, Plaintiff Elizabeth Mullen has suffered emotional distress and pecuniary hardship due to her child's mental harm resulting from social media addiction.

230.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton conduct toward underage users, including N.M., whom they knew or should have known would be seriously harmed through use of their social media products.

## COUNT IV – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS & PROF. CODE §§ 17200, et seq.

231.    Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully stated herein.

232.    Defendants are corporations and thus each of them is a "person," as defined by California Business & Professions Code § 17201.

233.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

234.    Defendants' conduct was unlawful as set forth in Counts I–III, above.

235.    Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including N.M., while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products, including N.M.

236.    Defendants convinced minors, including N.M., that their products were "free" when, in fact, N.M. was the product and Defendants profited from their scheme – making billions in revenue each year by deceiving consumers in this manner.

237.    Defendants advertised and represented that their products were safe and/or that they

were taking reasonable measures to ensure the safety of users when, in fact, Defendants failed to implement safety protocols during the design process and, even when they identified or were informed of product defects, refused to recall or stop distributing their products to minors.

238. Defendants advertised and represented that their products were safe and/or that it was taking reasonable measures to ensure the safety of users and further, that their products were "free" when, in fact, Defendants deliberately designed their products to be addictive and were garnering incredible profits due to the harms they were causing minors. Defendants' products have never been "free," but instead, comes at a high cost to minors.

239. Defendants knew that their products were addictive and/or harmful to a significant portion of users, including children and teens. Because of Defendants' deliberate and ongoing misconduct and active concealment of the truth, however, Plaintiffs could not reasonably have discovered the truth until after the Facebook whistleblower came forward with documents showing that companies like Meta and TikTok know that their products are harmful and how the products themselves operate. It was only then that anyone –other than Meta and TikTok– was able to discover what Defendants were doing and how.

240. Defendants' conduct, as described herein, offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Defendants engaged in unfair methods of competition and unfair and deceptive acts in the conduct of trade and commerce and benefitted greatly from the harms it knew it was causing to American children.

241. Defendants further engaged in fraudulent and deceptive business practices in violation of the UCL by designing their product in a manner intended to evade parental protection and consent. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their product were misleading and therefore likely to deceive the members of the public who use Defendants' products. Had Plaintiffs known of the dangerous nature of Defendants' products, they could and would have taken early and aggressive steps to stop or limit use of it.

242. Defendants' practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly

outweighs any benefits associated with them.

243. Defendants' conduct has resulted in substantial injuries that Plaintiffs could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

244. As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained an unfair advantage over similar businesses that have not engaged in such practices.

245. As a result of Defendants' UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

246. Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendants' unlawful, fraudulent, and unfair conduct.

### COUNT V – UNJUST ENRICHMENT

247. Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully stated herein.

248. As a result of Defendants' conduct detailed herein, Defendants received a benefit. Because Defendants' advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram and TikTok, Defendants benefited directly from N.M.'s addiction to and use of their products.

249. It would be unjust and inequitable for Defendants to retain the ill-gotten benefits at Plaintiffs' expense and in light of Defendants' acts and omissions described herein.

250. Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

### COUNT VI – INVASION OF PRIVACY

### (California Const. Art. 1, § 1)

251. Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully stated herein.

252. Defendants intentionally intruded upon Plaintiff Elizabeth Mullen's solitude,

seclusion, or private affairs by knowingly designing their product with features that were intended to, and did, frustrate her ability to monitor and control her children's social media usage.

253.     These intrusions are highly offensive to a reasonable person, particularly given Defendants' interference with the fundamental right of parenting and their exploitation of children's special vulnerabilities for commercial gain.

254.     Plaintiffs were harmed by Defendants' invasion of privacy, as detailed herein.

255.     Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendants to cease the harmful practices described throughout this complaint.

## COUNT VII – SEX DISCRIMINATION

### (Unruh Civil Rights Act, Cal. Civil Code §§ 51, 52(a))

256.     Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully stated herein.

257.     The California Unruh Civil Rights Act provides that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).  For purposes of the Unruh Act, the word "Sex" "includes, but is not limited to, a person's gender." *Id*. at § 51(e)(5).

258.     The Unruh Act applies to online business establishments.

259.     As described above, Defendants have intentionally, knowingly, and purposefully engaged in discriminatory practices that deny girls and women the full and equal accommodations, advantages, facilities, and services of Defendants' business establishments, including but not limited to classifying, categorizing, and segregating its users by gender; and intentionally directing harmful content, including content related to eating disorders, to girls and women because of their gender.

260.     These discriminatory practices are not supported by any compelling social policy or societal interest.

261. Defendants are liable to Plaintiffs for statutory damages pursuant to section 52(a) of the California Civil Code for each and every offense, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

262. Plaintiffs are further entitled to all other legal and equitable relief available, including injunctive relief.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Defendants for relief as follows:

1. Past physical and mental pain and suffering of N.M., in an amount to be more readily ascertained at the time and place set for trial.

2. Loss of future income and earning capacity of N.M.

3. Past and future medical expenses of N.M.

4. Past physical and mental pain and suffering of Elizabeth Mullen in an amount to be more readily ascertained at the time and place set for trial.

5. Monetary damages suffered by Elizabeth Mullen.

6. Punitive damages.

7. For the reasonable costs and attorney and expert/consultant fees incurred in this action.

8. For injunctive relief.

9. Such other and further relief as this Court deems just and equitable.

DATED this 9th day of February, 2023.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _____
    Laura Marquez-Garrett SBN 221542
    Laura@socialmediavictims.org

Matthew P. Bergman
matt@socialmediavictims.org
Glenn S. Draper
glenn@socialmediavictims.org
Sydney Lottes, SBN 345387
sydney@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Tel: (206) 741-4862   Fax: (206) 957-9549

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Tel: (973) 639-9100   Fax: (973) 679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Tel: (503) 702-0218   Fax: (503) 768-6671

Attorneys for Plaintiffs